## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
#### (Greenbelt)

| | | |
|---|---|---|
| TIFFANY LAGENIA NOELS, | * | |
| ON HER OWN BEHALF, AND | * | |
| AS GENERAL GUARDIAN OF MINOR | * | |
| CHILD, J.B. | * | |
| | * | |
| PLAINTIFFS | * | |
| | * | |
| v. | * | Civil Action No.: 8:17-cv-03218-GJH |
| | * | |
| | * | |
| OCWEN LOAN SERVICING LLC | * | |
| 2711 CENTERVILLE RD | * | |
| STE 400 | * | JURY DEMAND |
| WILMINGTON, DE 19808 | * | |
| | * | |
| Serve on Registered Agent: | * | |
| | * | |
| CSC-LAWYERS INCORPORATING | * | |
| SERVICE COMPANY | * | |
| 7 ST. PAUL STREET | * | |
| SUITE 820 | * | |
| BALTIMORE, MD 21202 | * | |
| | * | |
| | * | |
| DEUTSCHE BANK NATIONAL TRUST | * | |
| 60 WALL STREET | * | |
| NEW YORK, NY, USA | * | |
| | * | |
| Serve on Registered Agent: | * | |
| | * | |
| C T CORPORATION SYSTEM | * | |
| 111 EIGHTH AVENUE | * | |
| NEW YORK, NY, 10011 | * | |
| | * | |
| BROCK & SCOTT, LLC A/K/A | * | |
| BROCK & SCOTT, PLLC | * | |
| SUITE 100 | * | |
| 1315 WESTBROOK PLAZA DRIVE | * | |
| WINSTON-SALEM, NC 27103 | * | |
| | * | |
| Serve on Registered Agent: | * | |
| | * | |

THE CORPORATION TRUST,            *
INCORPORATED                      *
2405 YORK ROAD                    *
SUITE 201                         *
LUTHERVILLE TIMONIUM, MD          *
21093-2264                        *
                                  *
SHAPIRO & BROWN, LLP              *
10021 BALLS FORD RD               *
STE200                            *
MANASSAS, VA 20109                *
                                  *
Serve on Registered Agent:        *
                                  *
THE CORPORATION TRUST,            *
INCORPORATED                      *
2405 YORK ROAD                    *
SUITE 201                         *
LUTHERVILLE TIMONIUM, MD          *
21093-2264                        *
                                  *
DEFENDANTS                        *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## AMENDED COMPLAINT[1]

Plaintiffs, TIFFANY LAGENIA NOELS and the minor child, J.B., by and through their

attorney, Marie Lott Pharaoh, file this Amended Complaint[2] against Ocwen Loan Servicing,

LLC ("Ocwen"), Brock & Scott, LLC, as Substitute Trustees,  Shapiro &  Brown, LLP[3],

Ocwen's and Deutsche Bank National Trust Company's ("Deutsche Bank") attorneys in the

United States Bankruptcy Court, Deutsche Bank, serving as Trustee for Novastar Mortgage

Funding Trust, Series 2006-4, Novastar Home Equity Loan Asset-Backed Certificates, Series

2006-4, which claims ownership of Plaintiff's original note, as grounds therefore avers:

---

[1] A comparison copy of the changes made herein is attached as *Exhibit 1*. The Plaintiff has elected to provide all the attachments with this Amended Complaint since the Original has not been filed. The singular "Plaintiff" will be used throughout to include both Plaintiffs.

[2] Pursuant to Fed. R. Civ. P. 15(a)(1)(B) the Plaintiffs are permitted "as a matter of course" to amend their original Complaint without the need for leave of the Court or consent of any other party.

[3] This Amended Complaint also adds Shapiro & Brown, LLP as a party Defendant.

## INTRODUCTION

This case is paradigmatic in that it shows fully the harm that Deutsche Bank, Ocwen and their unscrupulous attorneys inflict upon a homeowner when they, in concert, unfairly and deceptively fail to comply with State and federal laws. In their perfidy, they take advantage of the stream-lined procedures they are available to them in both the United States Bankruptcy Court and in the foreclosure actions in our State courts. Now is the time for this Enterprise to be exposed and dealt a death blow.

The basis of this federal suit is that Deutsche Bank's agent Ocwen and Ocwen's agents, Brock & Scott and Shapiro & Brown, perpetuated a fraud not only upon the Plaintiff, but upon both the State and federal courts by falsely presenting, as the basis of Plaintiff's indebtedness and default, a void loan modification agreement entered into by Ocwen and the Plaintiff on August 12, 2012 ("Agreement"). *Exhibit 2*.

The Defendants knew or should have known that the Agreement was absolutely unenforceable. The Defendants' deceitfulness has resulted in great harm to the Plaintiff and her minor charge. Yet, what is even more insidious is that the both the foreclosure and bankruptcy attorneys took full advantage of the lack of testing of Ocwen's evidence in the foreclosure and bankruptcy actions to do what Ocwen wanted them to do:  unlawfully foreclose when the evidence supported a different result. Ocwen, by using law firms who would not question the documents provided or would simply not care about their veracity, found the ready conduits to continue its Enterprise of harming homeowners and perpetuating a fraud upon our courts of law and equity.

It would not be so far-fetched to say that entire foreclosure debacle that has wracked our country lie at the feet of legal professionals, like Brock & Scott, Shapiro & Brown, who have

failed time and time again to check the documents presented to them by the servicers or lenders of mortgage loans to insure they comport with the rules and laws governing the bankruptcy and foreclose processes.   These processes are not governed by the standard rules for documents. Instead, these documents are filed under or the penalties of perjury and the law firms can readily file documents that are given the imprimatur of truthfulness and accuracy without being tested.

Ocwen knew the Agreement was void. [4] It wrote those very words into the Agreement that appear in footnote 4.   When Ocwen acknowledged that there was an error in the principal balance, that triggered Ocwen's obligation to provide a corrected agreement and voided the Agreement executed on August 12, 2012. Its agents Brock & Scott and Shapiro & Brown, as officers of the court, had a duty to read the Agreement and to ensure that the affidavit submitted by Ocwen in the foreclosure action and the contents of the proof of claim in the bankruptcy Court comported with  applicable laws regarding the trustworthiness and accuracy of Plaintiff's indebtedness.   These attorneys failed to ensure that their client had in fact presented to them true and accurate statements and documents; having not performed their duties as officers of the court, they have, therefore, aided and abetted Ocwen in its continuing Enterprise of defrauding the courts and homeowners by unlawfully foreclosing on these homeowners.

At this point in 2017/2018, it is not unreasonable to expect the attorneys to exercise greater due diligence given the serious problems resulting in lawsuits, Consent Orders, Cease

---

[4] Section 4, Paragraph L of the Agreement:  **Corrections and Omissions**.

> You agree to execute such other and further documents as may be reasonable necessary to consummate the transactions contemplated herein or to perfect the liens and security interests intended to secure the payment of the loan evidenced by the Note. If an error in the terms hereof is detected after execution of this Agreement, you understand that a corrected Agreement will be provided to you and this Agreement will be void upon notice of such error. Should you elect not to sign any such corrected Agreement, your loan will revert to the terms of your original Loan Documents.

and Desist Orders involving Ocwen since 2013. [5] Deutsche Bank, moreover, should be held accountable for hiring Ocwen as its loan servicers with the latter's long history of illegal foreclosures, failing to provide homeowners with accurate information, and not properly supervising its hired attorneys.

Greater due diligence in the bankruptcy and foreclosure processes was also required, given the streamed-line nature of having evidence entered into these matters without being tested under the rules of evidence that have safe guards to test the accuracy and trustworthiness of evidence presented to the court. Due diligence is necessary because the defendant or debtor has to mount a defensive challenge against the presumptive validity of evidence already admitted as true and accurate. As with the Plaintiff's experience in both the foreclosure and bankruptcy actions, proceeding *pro se*, her affirmative challenges failed because there was a presumption that Ocwen's attorneys would only file documents that were true and accurate. Even when Debtor obtained counsel, the Bankruptcy Court refused to reconsider the lifting of the stay, refused to reconsider the denial of Plaintiff's Chapter 13 Plan, even though counsel made it clear that no Chapter 13 plan could be crafted based on the vagaries in the proof of claim and the void Agreement.[6]

Given Ocwen's sheer wanton and blatant behavior towards the Plaintiff and her young charge and its slipshod behavior in both the state and federal courts buoyed by its attorneys, it is not surprising that it now faces two separate law suits filed in 2017 by the Consumer Financial Protection Bureau and the State of Florida. In both lawsuits, the allegations stem from Ocwen's

---

[5] *Consumer Financial Protection Bureau, the State of Maryland et al. v. Ocwen Financial Corporation and Ocwen et. al,* Case No.: 1:13-cv-02025-RMC, filed in the District Court for the District of Columbia on December 19, 2013. *Consumer Financial Protection Bureau v. Ocwen Financial Corporation et al.,* Case No. 9:17-cv-80495 filed in the District Court for the District of Florida; State of Maryland's Commissioner of Financial Regulations issued a Cease and Desist Order (CFR-FY2017-13) against Ocwen in April 2017

[6] The Bankruptcy Court has granted the Plaintiff a hearing on her Objection to the Proof of Claim, scheduled for January 24, 2018.

unwillingness or incapacity to correct fraudulent and illegal business practices that have caused great harm to so many borrowers.

Furthermore, the State of Maryland's Commissioner of Financial Regulations issued a Cease and Desist Order (CFR-FY2017-13) against Ocwen in April 2017 preventing Ocwen from servicing new loans for Maryland residents.  It found that "the public welfare imperatively requires . . . and that it is in the public interest that [Ocwen] immediately cease and desist and be prohibited from acquiring additional mortgage servicing rights for Maryland mortgage loans, entering into additional mortgage servicing rights for Maryland mortgage loans, entering into additional agreements to subservice any Maryland mortgage loans in the State and retaining servicing rights on any newly originated mortgage loans,  until the Commission determines that Ocwen is in compliance with the Summary Order."  (Summary Order to Cease and Desist, Page 2).

Ocwen entered into Consent Judgment in matter known as *CFPB v. Ocwen Financial Corp.*, *et al.*, U.S.D.C. Dist. of Col., Case No. 1:13-cv-02025 in which it agreed to a settlement term sheet (available at https://d9klfgibkcquc.cloudfront.net/Ocwen-Consent-Judgment-Ex-A.pdf) that provides, among other responsibilities, that Ocwen must have "adequate and competent staff to answer consumer disputes promptly" and "take appropriate action to promptly remediate any inaccuracies in borrowers' account information." Still Ocwen's baneful activities of failing to respond and correct errors continued -- wending their way into the Plaintiff's life with such grave results.

What makes this case noteworthy in terms of Ocwen's egregious behavior is that Plaintiff was not behind in her mortgage payments. All she wanted to do was to get a principal reduction so that she could get a loan from the State of Maryland to make home repairs. Ocwen assured her

that it could provide her with such. What she got instead was a loan modification agreement ("Agreement") whose true terms were hidden behind what appeared to be a "good modification." The deceptively lower monthly mortgage payments created a balloon payment that thwarted Plaintiff's attempt to get the much needed loan to repair her home.   On the face of the Agreement, it is impossible to determine what the true nature of the loan terms are regarding the interest bearing principal balance; and, even more so,   how Ocwen calculated the balloon payment. Furthermore, Ocwen never explained fully the principle balance increase from $268,820.51 to $277,777.79.

After many efforts by the Plaintiff to get Ocwen to explain the terms and conditions in the Agreement, Ocwen finally admitted that it had miscalculated the principal balance amount at the inception of the Agreement, but adamantly refused to provide Plaintiff with a corrected agreement.

There are two poignant issues in this case.  First, the Agreement it is void as against the Plaintiff. Yet, Ocwen and its agents paraded it around in both the federal and state courts as if it were a valid and enforceable Agreement against the Plaintiff. Second, this very Agreement is a result of misrepresentation, deception, and fraud.   Its creation and subsequent enforcement violate both federal and state laws.

Let's deal with the latter issue first. On the surface of the Agreement, this appears to be a "good Agreement."   Plaintiff's monthly mortgage payments were reduced by half.   Ocwen separated the principal balance in the Agreement $277,777.79 into interest bearing ($137,241.45) and non-bearing interest ($140,563.34) principals.   It also noted that it would forgive $117,863.34 of the non-bearing interest principal.   Furthermore, it appeared in the Agreement that the interest bearing principal would be fully amortized in 287 months.

Yet, looming in the back of the Agreement is a huge balloon payment due and payable on July 1, 2036. And it stuns the mind, as well as the imagination, that this balloon payment is not a sum certain:   It could be as low as $91, 227.50 and as high as $209,090.84.  The question is, why if the reduced interest bearing principle appears to be paid in full, would a balloon payment be necessary, especially one that could fluctuate so widely?

Upon a thorough review, however, the monthly payments on the interest-bearing principal will not fully amortize that principal within the 287 months. The monthly payments of principle and interest of $415.52 as set forth in the Agreement should have been $616.61 each month. Therefore, unbeknownst to the Plaintiff and anyone else looking at the Agreement, each month she incurred a deficit of $201.09.

Not disclosed in the four corners of the Agreement, for the loan to be fully amortized, Plaintiff would have had to make payments for 480 months.  Ocwen rather than extending the payments to that mark, matured the loan at 287 months and created a balloon payment -- $91, 277.44 -- , which is the result of the amount still due on the interest-bearing principle -- $68,577.44 --  and the balance of the unpaid and unforgiven non-interest bearing principal -- $22,700. What is even more troubling is why does the Agreement state that the balloon payment could be as much as $209,090.84?

Again, not disclosed in the Agreement, is that the balloon payment will be that amount, if the Plaintiff does not make timely payments for the non-interest bearing principal of $117,863.34 to be forgiven.  So, the full amount of the non-bearing interest of $140,563.34 added to the remaining balance of the interest-bearing principle of $68,577.44 is what would make the balance payment the higher amount.  Should it take a Harvard Law School graduate with over 25 years of legal experience to figure this out?

On the first issue, the Plaintiff, after Ocwen acknowledged that it had made a mistake in adding $8,107.32 to the deferred principal balance in the Agreement and other mistakes, continuously asked for a corrected Agreement. The request was not unreasonable because it comported with the terms of the Agreement.

Under the terms of the Agreement, Section 4, paragraph L, the Agreement was void upon notice of an error and Ocwen obligated itself to provide the Plaintiff with a corrected agreement.

Ocwen has never provided the Plaintiff with a corrected agreement and the ramifications have been great.  If Ocwen had fulfilled its responsibility under the Agreement, and simply provided the Plaintiff with a corrected Agreement, then the Plaintiff and her young 8 year old charge would not have suffered such extreme emotional distress and hardship as they have for close to three years.

Nor would there have been would have been a foreclosure action filed in the Circuit Court for Prince George's County with three foreclosure sale dates.[7]

Nor a bankruptcy action filed by the Plaintiff in the United States Bankruptcy Court, where Ocwen and its lawyers followed her there, fiercer than wolves at dusk, to have the automatic stay lifted.

Nor would she have any business in this Honorable Court.

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C.A. § 1331 since certain of the claims asserted herein arise under the laws of the United States. This Court also has jurisdiction pursuant to 28 U.S.C.A. § 1332 since the amount in controversy

---

[7] The first foreclosure sale was stayed for foreclosure mediation; the second sale scheduled for November 29, 2016 was stayed because the Plaintiff filed her Chapter 7 Bankruptcy case, and the third foreclosure actually took place on November 1, 2017 after the stay was impermissibly lifted in the United States Bankruptcy Court.  The family home was sold to Ocwen.

exceeds $75,000 and the parties are citizens of different states. Finally, the Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C.A. § 1367 since those claims are so related to the federal claims asserted herein that they form part of the same case and controversy.

2. This Court has jurisdiction over Plaintiffs' claims alleging violations of the Fair Debt Collection Practices Act ("FDCPA") against Defendants Brock & Scott and Shapiro & Brown; Racketeer Influenced and Corrupt Organization Act, 28 U.S.C. §1962 against all Defendants; Declaratory and Injunctive Relief pursuant to 28 U.S.C. § 2201 against Defendants Deutsche Bank and Ocwen. As a result of information obtained by Plaintiff in the course of the foreclosure and bankruptcy litigation, and as a result of Defendants' actions herein, Plaintiff now has grounds to sue Defendants for multiple breaches of state and federal laws and requests that this court take jurisdiction over those claims.

3. Venue is appropriate in this Court pursuant to 28 U.S.C.A. § 1391 because a substantial portion part of the events or omissions giving rise to the claims before the Court occurred in this District.

## PARTIES

4. Plaintiff Tiffany Lagenia Noels resides at her family at 1214 Iron Forge Road, District Heights, MD 20747, and is disabled and guardian of 8 year old J.B., whom she has cared for since he was 3-weeks old.

5. Defendant Ocwen Loan Servicing, LLC ("Ocwen") is a non-bank, Delaware Corporation licensed as a Maryland mortgage lender and is a debt collector. Ocwen became the mortgage servicer for Plaintiff's loan on or about April 2, 2012.

6. Defendant Brock & Scott PLLC is the Substitute Trustees in the State foreclosure case, acting on behalf of Ocwen. It is a North Carolina Corporation, registered to conduct business in the State of Maryland.

7. Defendant Shapiro & Brown, LLP, is a limited liability Virginia partnership registered to do conduct business in the State of Maryland.

8. Novastar Mortgage Funding Trust, Series 2006-4, Novastar Home Equity Loan Asset-Backed Certificates, Series 2006-4, with Deutsche Bank National Trust Company serving as Trustee is the alleged holder and owner of Plaintiff's original promissory note. The Trust was allegedly established by Novastar according to documents found on the United States Securities and Exchange Commission's website. Deutsche Bank National Trust Company is a New York Corporation.

### BACKGROUND FACTS:  AGREEMENT TRANSACTION AND THE DESCENT INTO DANTE'S INFERNO

9. On June 14, 2006, Plaintiff executed a promissory note in the amount of $278,800.00 with an adjustable rate mortgage loan ("ARM loan") and a deed of trust ("DOT") on real property located at 1214 Iron Forge Road, District Heights, Maryland 20747.[8]

10. The debt obligation was originated by NovaStar and was allegedly sold to Novastar Mortgage Funding Trust, Series 2006-4, Novastar Home Equity Loan Asset-Backed Certificates, Series 2006-4 with Deutsche Bank National Trust Company serving as Trustee on or about August 14, 2008.

---

[8] At the time Plaintiff was married and she and her husband held title to the property as tenants by the entirety.  On or about September 10, 2010, her husband quit claimed his interest in the property to the Plaintiff, who then became sole owner.

11.  Her ARM loan was modified by Saxon Mortgage, which provided a fixed rate of 8.85 percent from September 1, 2008 until August, 1, 2013. Then from September 1, 2013, until July 2036, the interest rate would be determined in accordance with the terms of the note and would change every six months.  It also added a balloon payment of $8,107.32.

12. Although Plaintiff was not behind on her mortgage, she sought assistance from the Neighborhood Assistance Corporation of America ("NACA") due to the 2008 loan modification predatory nature and balloon payment. As a result Saxon reluctantly modified the loan on September 3, 2009.   The unpaid principal $273,997.13 accrued interest at a yearly rate of 8.850% from June 1, 2009, through July 1, 2009.

13. After application of the accrued but unpaid interest due on July 1, 2009 through September 1, 2009, payments at the interest rate of 8.850%, the terms required that $6,245.42 would be added to the indebtedness resulting in a new principal balance of $280,242.55.  Afterwards, the unpaid balance would accrue at a rate of 2.5% for the remainder of the loan--with NO BALLOON PAYMENT or disclosure.

14. On or about April 2, 2012, the loan was transferred from Saxon to Ocwen for servicing.

15. Plaintiff paid in full and on time since obtaining the 2009 loan modification and at the time of the transfer, she was notified that her unpaid principal balance was $269,202.46 and an escrow balance of $1,067.55.

16. Plaintiff promptly sent Ocwen a copy of the 2009 loan modification agreement with Saxon, which did not include either the deferred principal balance or the prior servicer fee.

17. Upon making her April 2012 payment on time in the amount of $1,247.05, Plaintiff contacted Ocwen to inquire about a loan modification.

18. She informed Ocwen that she had a minor child whom she had since he was 3-weeks old weeks, who suffered from severe allergies, and that she was seeking a reduction in the principle balance to take advantage of a Maryland State Housing Rehabilitation Program ("Program")[9] through the Housing Initiatives Partnership, Inc.

19. This Program would allow her to make structural hazards repairs to her home to remove existing lead and mold, and replace a faulty breaker box, which was recalled as a fire hazard as noted in the attached home inspection report. *Exhibit 3.*[10]

20. These hazardous conditions had already resulted in several housing and health code violations.

21. A principle reduction, she explained to Ocwen, would give the necessary equity in the home -- a requirement of the Program.

22. Ocwen reassured her that she would be offered a principal reduction.

---

[9] The purpose of the Maryland Housing Rehabilitation Program is to preserve and improve single family properties and one-to-four unit rental properties. It is a program designed to bring properties up to applicable building codes and standards.

[10] Although the home inspection report is dated in 2015, the Plaintiff reapplied to the program after Ocwen told her that it would be removing the balloon payment and that her principal balance would be $130, 415.

23. Ocwen offered Plaintiff a loan modification, with a total principal balance of $277,777.79, with the interest-bearing principal balance at 2 percent in the amount of $137,214.45, a ***deferred*** principal balance of $140,563.34 and a ***principal reduction feature*** in the amount of $117,863.34 due to be forgiven in three yearly increments of $39,287.78, if all payments were made timely.  Monthly payments were projected at $637.52 with $415.52 applied to principal and interest, and $222.00 applied to insurance and taxes.

24. While the monthly payments were about half of what Plaintiff was paying under the loan modification agreement with Saxon, Plaintiff realized her total principal balance had increased by a little over $11, 000  and she wanted more clarity on the structure of the balloon payment of $209,090.84 due on July 1, 2036.

25. Plaintiff immediately informed Ocwen that she neither wanted nor needed the modification.

26. Ocwen replied that if she did not accept the loan modification she would have to pay the difference between her payments under the Saxon loan agreement and the trial modification payments, which was approximately $2,500 plus interest accrued, within 10 business days.

27. Plaintiff, fearing losing her home because she did not have $2,500 nor any means to obtain the same within 10 business days, believed she had no choice but to sign the Agreement.

28. Still troubled by the balloon payment and the increase in the principal balance amount, Plaintiff contacted Ocwen to inquire as to how it calculated the balloon payment and why the total principal balance had increased when according to a

inquiry response letter sent by Ocwen, dated April 11, 2012, the principal balance was $268,990.89; yet in the Agreement it appeared as $277,777.79.

29. It also appeared that Ocwen did not credit any of her pre- loan modification payments to the balance.

30. Several months after signing the Agreement, an emergency family crisis occurred that resulted in Plaintiff getting emergency custody of her 2-year old cousin. The Department of Child and Family Services was hesitant to place the child with her permanently due to all of the hazardous issues and repairs the home required.

31. Nevertheless, the child was placed in her custody on June 18, 2013 with the caveat that Plaintiff makes the necessary repairs immediately.

32. Plaintiff then immediately contacted the Program to apply once again, (she had been applying since 2009) but was denied because there was no equity in her home and the excessively large balloon payment.

33. Plaintiff again called Ocwen to inquire about the principal balance discrepancy and for explanation of the balloon payment, but each time she was told that Ocwen had not made an error in its accounting.

34. Ocwen informed the Plaintiff that Saxon had transferred a deferred principal balance in the amount of $8,107.32 and a $171.33 prior servicer fee in addition to the unpaid balance. *Exhibit* 4. (Letter from Ocwen to Plaintiff, dated September 12, 2014, wherein Ocwen stated that the $8,107.32 was a result of Saxon transferring the loan to it with the deferred principal balance.)[11]

---

[11] This is nothing new for Ocwen. In the 2013 *Consumer Financial Protection Bureau, the State of Maryland et al. v. Ocwen Financial Corporation and Ocwen. et. al,* Case No.: 1:13-cv-02025-RMC, part of Ocwen's bad acts was to provide "false or misleading information in response to borrower complaints and providing false or misleading information to  borrowers regarding loans that have been transferred from other servicers." p. 12.

35. Another baffling issue arose in April 2014, Plaintiff began to receive several conflicting escrow analyses which would increase her monthly payment by approximately $50.00 although she was current in her payments, and the analyses stated that she had an escrow balance deficiency of $0, but a shortage with the amount totaling $1,000.

36. In May 2014, Ocwen provided an escrow analysis showing that deficiency was $0, but the shortage was $643, stating that her monthly mortgage payment would increase from $627.52 to approximately $685 per month.

37. Plaintiff immediately questioned the accuracy of that analysis. After numerous phone calls, she was then transferred and assigned to Ms. Joyce Skinner in Ocwen's research department.

38. Plaintiff pointed out that that her property taxes had not increased and that the homeowner's insurance had decreased. Ms. Skinner replied that she would investigate.

39. Plaintiff called Ms. Skinner weekly. Ms. Skinner became very rude and dismissive, stating that she would give Plaintiff a call once she had information.

40. After approximately three weeks, Ms. Skinner finally called and informed Plaintiff that Ocwen had performed another escrow analysis, which was even higher than the prior analysis, showing the escrow shortage as $886. Plaintiff, however, never received the analysis in writing.

41. When Plaintiff questioned Ms. Skinner about the escrow analysis, Ms. Skinner simple stated that this escrow analysis was correct, and that Ocwen would not be

increasing the monthly mortgage payments.  Instead, it would spread the shortage over a period of 36 months as a courtesy.

42. Again, Plaintiff raised the issue with Ms. Skinner that if the property taxes had not increased and the insurance had decreased what was the basis for the shortage? Ms. Skinner simply replied that if there are any further questions, all she could do was request another analysis.

43. Ms. Skinner informed Plaintiff informed on June 16, 2014, that Ocwen had performed a "tax back" search and determined that her county taxes for 2013 first and second installments were paid in the amount of $586.42 each.  She determined that taxes were paid, current, and there was no overpayment or duplicate payments made.  She also discovered that a refund in the mount of $41.48 should be refunded to the Plaintiff's attention on January 23, 2014 in care of Ocwen. —but Plaintiff never received that refund.

44. Plaintiff, not satisfied with Ms. Skinner's analysis or response, and in total bewilderment concerning the "refund," then contacted the Ocwen's Ombudsman's office and asked to speak with a superior.  She was transferred to Mr.  Matthew Parker.

45. She explained to him that she was in contact with Joyce Skinner, but she was very rude and of no assistance. While speaking to Mr. Parker, Plaintiff informed him that she had two small kids and that her home was in disrepair and underwater and in order to qualify for the Maryland Rehabilitation Loan Program, she needed the issues related to the Agreement addressed and corrected to result in a true principal reduction.

46. Plaintiff explained that while she was extremely grateful for the lower mortgage payment; yet, the incorrectly calculated Agreement along with the balloon payment rendered her ineligible to qualify for the Program,—which defeated the entire purpose for getting the modification.

47. Mr. Parker apologized for the inconvenience and said that he would definitely look into Plaintiff's issues and to give him seven to ten days to try to get the matters resolved.  After ten days, with no response, Plaintiff contacted him.  He, however, still did not have an update.

48. During that time, Plaintiff was under extreme emotional distress because she knew that if she did not get the home repairs completed, she would lose her cousin, as Child and Family Services set deadlines for the repairs and threatened to remove the child from her custody if the repairs were not completed.

49. Panic stricken, Plaintiff frantically began calling Mr. Parker several times a day, every day for weeks in hopes that something could be done.

50. She thought, that if Ocwen would just remove the monies that she did not owe including the balloon payment that were wrapped into the loan, then the Agreement would be sufficient to show that she had equity in the property and that she would qualify for the Maryland Rehabilitation Loan Program.

51.  Finally, after weeks of waiting Mr. Parker called the Plaintiff only to inform her that he was still researching the loan issues.

52. Plaintiff again explained the urgency of having a corrected agreement.   She told him about the Agency's deadlines and, if not met, she would lose custody of her niece.   In tears, she pleaded with Mr. Parker to expedite the research because she

desperately wanted the child to stay in her home as the baby girl was finally stable and had a strong bond with J.B.

53. Mr. Parker deeply apologized to the Plaintiff and said he would do his best and urged the Plaintiff not cry nor worry.

54. Under tremendous stress and strain, dealing with health issues, two small children, ages 2 and 5, Plaintiff began to buckle under the pressure and immediately began experiencing extreme anxiety, depression and breakouts.

55. Plaintiff was subsequently prescribed an antidepressant (Wellbutrin XL 400 milligrams), the narcotic Tramadol 50 milligrams, and Ambien sleeping pills to cope with the insomnia, which left the Plaintiff lethargic.  Due to her parental responsibilities Plaintiff made the decision to only take the Wellbutrin.

56. With the delay in hearing from Mr. Parker and the deadlines for repairs not met, Child and Family Services were no longer confident that the necessary repairs would be had, the baby girl was removed from the home, leaving the Plaintiff and J.B. completely devastated.

57. Although feeling extremely angry and defeated, Plaintiff contained herself in order to console J.B. Plaintiff; but, then, she began to withdraw completely from friends, had no energy, and paid no attention to her basic self needs, and became overly-focused and protective of J.B.

58. Due to the disrepair of the home and with the surrounding homes being pristinely maintained, the neighbors became very hostile towards the Plaintiff thus deepening her depression.

59. Desperately wanting her child to experience some happiness in the midst of all the turmoil, Plaintiff felt it was best for them to stay indoors mostly, only leaving out to take J.B. to school and grocery shopping.

60. Due to the conditions in the home, J.B.'s allergies increased, which caused the Plaintiff to feel an enormous amount of guilt and hopelessness, triggering even more anxiety, stress, and depression.

61. Not willing to be totally defeated by Ocwen's silence, Plaintiff began calling every day for two to three weeks.  When she finally spoke to Mr. Parker, he informed her that everything was correct: Ocwen did nothing wrong, and that she should receive a new escrow analysis.  Yet, he could not explain the calculation of the balloon payment.

62. Mr. Parker informed Plaintiff that if there were any further questions, Plaintiff needed to speak to Joyce Skinner.  At that point, Plaintiff asked why she needed to talk to Ms. Skinner when Plaintiff had been already explained that Ms. Skinner was rude and dismissive, and not helpful the first time.  He said that this matter was resolved and disconnected the phone call.

63.  Plaintiff then began calling every day throughout the day to try to reach either Mr. Parker or Ms. Skinner to no avail.  When she called customer service, she was told that she could leave a message to get in contact with them.  Plaintiff left countless messages, but never received a response from either.

64.  Finally, Plaintiff called customer service once more, but was told that if she had any further questions she would have to put them in writing.

65. As instructed, on August 24, 2014 Plaintiff sent Ocwen a Qualified Written Request (QWR).

66. Ocwen's response to the Plaintiffs QWR was postmarked early October 2014, though the letter was dated September 12, 2014. *See Exhibit 4.*

67. (Plaintiff, at the time, did not realize the importance of the document. For this litigation, it is the "burst of light" that signals the extent of Ocwen's deception and fraud.)

68. Plaintiff then contacted the Ombudsman's office and asked to speak to a supervisor other than Mr. Parker, but Plaintiff was immediately transferred to Mr. Parker.  She informed Mr. Parker that she was not interested in speaking to him or Ms. Skinner and that she wanted to speak to his supervisor.

69. After approximately 37 minutes of constantly stating that the Plaintiff needed to speak to his supervisor, not him, Plaintiff was then given the name of Mr. Collin Hoffman.  Plaintiff asked if she could be transferred, but was told that she could not and would need to call back.  After several attempts, Plaintiff was able to reach Mr. Hoffman and he confirmed that he was Mr. Parker's supervisor.  Plaintiff began making him aware of all that transpired, and her maltreatment by Ocwen. Mr. Hoffman apologized and stated that he would look into it, but to allow him time.

70. After approximately two weeks, Mr.  Hoffman sent Plaintiff an e-mail stating that he had unforeseen circumstances and his assistant would contact her with a response addressing her concerns.  His assistant left a voice mail, but Plaintiff could **never** get in touch with her.

71. At that point, Plaintiff contacted every pro bono and free legal service and even law school clinics that Maryland offered, but to no avail: no one made the choice to help her and Plaintiff was told that she did not have a case.

72. Plaintiff contacted HAMP about the loan modification and asked for an investigation to be done. HAMP determined that Ocwen was in compliance, even though Ocwen made many inconsistent misrepresentations one being that the Plaintiffs loan was a balloon mortgage and that the Plaintiff had an escrow shortage of $435.78.

73. In a desperate attempt to seek outside resources once more to assist her with her case, Plaintiff began contacting pro bono lawyers and legal aid programs but was told they only provided legal assistance people in foreclosure. Plaintiff once again began the task of trying to negotiate a reasonable solution between Ocwen and herself.

74. In late October 2014, Mr. Parker contacted Plaintiff by phone stating that Ocwen would remove the $8,107.32 erroneously added to the principal balance and that Ocwen removed the $888 from her escrow account. He also apologized for this inconvenience. Plaintiff informed him that just removing the $8,107.32 would not suffice. Plaintiff told him this was not the only mistake. Plaintiff also needed to know about the configuration of the balloon payment.

75. She also told him what had happened to her and her family. As a result of Ocwen's reckless malfeasance, Plaintiff's cousin was removed from her home, and how J.B. had suffered greatly as a result of that loss, as he had bonded with the baby girl.

76. Mr. Parker apologized and stated that he would look into the matter to see what could be done in terms of compensation.  Plaintiff asked him to put everything in writing and to include that credit reporting would be suppressed, foreclosure activity would not occur, and any fees accessed to the loan would be waived for the duration of his research.

77. Plaintiff did not hear from Mr. Parker again until mid January 2015 by phone stating that Ocwen would do away with the entire balloon deferment and the loan balance would start at $130,415.

78. Plaintiff went back to the Housing Initiatives Partnership, Inc. to reapply for the loan rehabilitation and upon checking her credit report discovered that it indicated that the loan balance was in fact $130,415. *Exhibit 5*.

79. Once again, Plaintiff told him to put that in writing and he acknowledged that he would.

80. Considering Ocwen's past reckless disregard for the truth, Plaintiff called customer service to verify.

81. Plaintiff discovered that Ocwen had attached a $39,287.78 forbearance payment. Plaintiff promptly sent Mr. Parker an e-mail questioning this forbearance because, according to Ocwen's modification appeal review, the last increment of $39,287.78 was forgiven on July 7, 2014.

82. On January 27, 2015, Mr. Parker sent Plaintiff an e-mail purposely avoiding the true facts, and once again manipulated the Plaintiffs account records, stating that Ocwen's accounting was correct.  Even though Plaintiff requested a corrected modification, as the Agreement clearly stated that Ocwen had to provide a

corrected agreement,   Mr. Parker emphatically stated that there was no need for one and that one would not be sent. Plaintiff was then informed that matter was resolved.  Plaintiff outraged, e-mailed back stating that the matter was not resolved and there were still a lot of unanswered questions.

83. Ocwen then instructed the Plaintiff to contact Ocwen's attorneys, Edward W. Chang of Blank & Rome, LLP.  Upon speaking with him, Plaintiff informed him that she needed Ocwen to send out a corrected agreement that would correct the $8107.23 error in the deferred principal balance that Ocwen stated that it would correct.  He, however, said that Ocwen did not need to give her a corrected agreement. Plaintiff pointed out that Ocwen did, and cited section L of the modification.

84. Once again Plaintiff contacted the U.S. Attorney General's Consumer Protection Division, and spoke with Mr. Mikhail Raykher. He agreed to contact Ocwen on Plaintiff's behalf and provided her with a list of the same free legal organizations that she had previously contacted.  As before, she was unsuccessful in obtaining help.

85. Also, Plaintiff, after her last conversation with Mr. Parker felt that, with the principal balance now being $130,000, she believed that she had enough equity in her home to quality for Maryland's home rehabilitation program.

86. Plaintiff downloaded a copy of her mortgage verification from Ocwen's website, and went to the Maryland housing initiative partnership.

87. Plaintive applied and explained her nightmare experience with Ocwen to Ms. Jocelyn Harris at Housing Initiative Partnership.  During this process, Ms. Harris

helped Plaintiff through the first stage of the loan process—inspections, bidding, and loan write-up requirements.  She also informed her supervisor, Ms. Mary Hunter, of Plaintiff's issues in hopes that she could help get things resolved with Ocwen.

88. Mrs. Hunter informed Plaintiff that, although she no longer practiced law, she would try to help her resolve this matter.  She then put Plaintiff in touch with Melanie Murray Mfume, Esq., and from February 14 through May 7, 2015, Attorney Mfume attempted to mediate a solution with Ocwen's attorneys.

89. Ms. Mfume's attempts were futile as Blank and Rome would admit that Ocwen made mistakes only to come back later and say Ocwen did nothing wrong.  Ms. Mfume informed the Plaintiff that due to the impasse, she would have to litigate the matter and that Attorney Mfume needed a retainer of $5000.  Plaintiff was unable to afford Ms. Mfume to litigate and on May 7, 2015, Ms. Mfume sent a letter to Blank Rome informing them to contact the Plaintiff directly concerning the matter.

90. Plaintiff went on to contact Maryland Volunteer Lawyers Services (MVLS), Civil Justice, Consumer Law Center, law schools, Peter Holland, Esq., Ian Goldstein, Esq. and even Kia Chandler, Esq. again as well as countless others.  Ian Goldstein gave the Plaintiff a warm referral to MVLS so the Plaintiff applied once again.

91. The application was received in October 2015 and after countless unanswered calls and e-mails Plaintiffs case file was closed on April 22, 2016.  The reason given was that because her case appeared to be convoluted and costly to litigate, MVLS was unable to find a pro bono attorney to handle the case. Mr. Todd Smith from

Blank and Rome sent an e-mail stating that Ocwen wanted to offer Plaintiff a new agreement with monthly payments of $818.50, a deferred balance of $44, 181.50 and an interest bearing principal amount of $171,649.67 totaling $215,831.17.  He also stated that Plaintiff had to pay extra for forced-placed insurance.

92. Plaintiff asked Mr. Smith, "How did Ocwen arrive at those numbers?"  He replied "Ocwen just did."  When asked about the force-placed insurance Mr. Smith said that the Plaintiff had not been paying on the mortgage, and further informed Plaintiff that if she did not accept the new agreement, she would then be subject to the 2006 original mortgage terms.

93. Plaintiff tried to explain that the Agreement required Ocwen to provide her with a corrected Agreement and, only if she did not sign the corrected agreement would she be under the terms and conditions of the original promissory note.

94. It was at this time Plaintiff had her first full blown panic attack and broke out in hives. Her physician also increased Wellbutrin dosage to help with the extreme anxiety. This frightened the minor child to see the Plaintiff in such a state. He became afraid and even more worried about their situation and Plaintiff then decided that she would attempt to internalize whatever anxiety she felt.

95.  Plaintiff also experienced bouts of severe depression, feeling quite helpless and overwhelmed by the situation. The minor child's allergy attacks also worsened during this time.

96. Plaintiff also discovered that J.B. was hoarding uneaten food in his room and after talking to his teachers, he was throwing away his homework and progress reports.

97. He also became increasingly clingy and adamantly refused to sleep in his room alone, and continually asked the Plaintiff where will they go and what would they do if their home was sold?

98. Plaintiff became ever more despondent, but found comfort in volunteering at J.B.'s elementary school.

99. One morning, the school principal asked to speak to the Plaintiff. She stated that she was concerned about the Plaintiff as her appearance had changed and the principal noted that she did not appear to be her jovial self. Plaintiff broke down and although extremely embarrassed, disclosed all the turmoil and fear she faced regarding the prospect of losing her home.

100. The principal offered her support as well as the school's.

101. Plaintiff continued her attempts to find legal assistance, but to no avail.

102. Unbeknownst to the Plaintiff at the time, things would only get worse.

## FORECLOSURE CASE:  BEYOND DANTE'S EIGHT AND NINTH CIRCLES

103. Brock & Scott, operating as the Substitute Trustee, filed an order to docket on February 10, 2016.

104. In the order to docket, the Substitute Trustees did not include the Agreement, but only a copy of the Plaintiff's original note. Yet, the affidavit of the total indebtedness filed in that case was based on the void Agreement

105. Although Ocwen can argue it followed the letter of the law, as Md. Rule 14-207(b)(3) requires only the note or other instrument to be filed with the order to docket; still the Agreement should have been provided to support the affidavit

required to be filed per Md. Rule 13-207(b)(2) regarding the right to foreclose and the total debt owed.

106. Still, the affidavit, though supported by an affidavit of the truth and accuracy of the debt owed is not accurate because the total debt should not contain the deferred principal balance of $39, 287.78, as the deferred principal balance was totally forgiven as of July 7, 2014 per Ocwen's letter dated October 26, 2014. *Exhibit 6*.

107. On February 10, 2016, Plaintiff received final loss mitigation report stating that Ocwen did not conduct a loss mitigation analysis because "Borrower told RM on 12-2-2015 she would not be making another payment until she received correct loan modification documents."

108. Plaintiff then filed a motion for mediation and a date was set for June 21, 2016.The Substitute Trustees filed a motion to strike, which the Court denied.

109. Plaintiff relying on her phone's GPS, got lost traveling to the mediation site. She asked the Court for reconsideration  to have another loss mitigation hearing, the Court denied that.

110. Finally, the second foreclosure sale was scheduled on November 30, 2016.

## BANKRUPTCY CASE: INTO THE FIRE

111. Plaintiff, still proceeding *pro se*, on November 29, 2016 sought protection in the United States Bankruptcy Court and filed her Chapter 7 case to stay the foreclosure.

112. Ten days later, Ocwen, via Shapiro & Brown, filed a motion to lift the automatic stay.[12]

---

[12] This is a highly unusual step for a creditor to take because the automatic stay in a Chapter 7 ends at the time of the debtor's discharge, which is usually about four months after the filing of the voluntary petition.

113. Plaintiff responded in opposition, and on February 1, 2017, Ocwen withdrew the motion without explanation.

114. Plaintiff still unrepresented and still seeking to stave off the sale of her home converted her Chapter 7 case to a Chapter 13 on April 3, 2017.

115. On July 6, 2017, Ocwen filed a motion for relief from the automatic stay.

116. The Bankruptcy Court after a hearing granted Ocwen's motion.

117. Plaintiff tried valiantly to get the Bankruptcy Court to consider that the Agreement could not be enforced as it was void, but the Bankruptcy Court for its own reasons saw things differently.

118. Plaintiff finally found counsel to assist her.

119. On September 19, 2017, counsel filed a Motion to Reconsider, but the Bankruptcy Court on October 19, 2017 denied Plaintiff's Motion.

120. Counsel unperturbed by Ocwen's failure to respond to the Motion to Reconsider decided to review the proof of claim to further investigate Plaintiff's claims that what Ocwen said she owed was incorrect.

121. Also Counsel wanted to determine, as well, whether she could fashion a Chapter 13 plan to at least try to keep the foreclosure from taking place.

122. Upon a thorough review of the proof of claim, counsel filed an Objection to the proof of claim.

123. In Bankruptcy Court, the Rules allow for a creditor to submit documents untested by the usual rules of evidence. Once submitted a proof of claim is essentially

allowed as evidence of the debt owed.[13]  It is without question, in the first instance, a true, accurate and valid instrument of the debt owed.

124. The Bankruptcy Rules place the onus on the debtor to refute the accuracy of the proof of claim.

125. Still, the creditor is cautioned by the several statutes to ensure the accuracy of the proof of claim.[14]

126. As noted in the Objection, the fraudulent and inaccurate proof of claim prevented the Plaintiff from being able to fashion a viable and confirmable Chapter 13 plan, even if she wanted to in spite of the void of the Agreement, supporting the proof of claim.

127. Plaintiff has endured enough and is bringing this action to this Honorable Court for it to hear her Amended Complaint and rule on the issues presented to end this nightmarish hell so that she may find peace and a safe harbor to begin to live her life again with J.B.

## COUNT I

### BREACH OF CONTRACT
### (Against Defendant Ocwen)

128. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

---

[13] 11 U.S.C. §502(a) provides:

A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

[14] Congress in an effort to maintain the integrity of the claims process in the Bankruptcy Court enacted stiff penalties, both civil and criminal for the filing of a false claim. Rule 3001(c)(2) (D) provides for sanctions to include attorneys' fees and gives the Bankruptcy Court wide latitude to fashion remedies to uphold the integrity of the Court. 18 U.S.C. § 152(4) provides for $500,000 fine and/or 5 years in prison. There is also the voiding power found in 11 U.S.C. §506(d) for secured claims disallowed for reasons other than untimeliness.

129. While Ocwen was not obligated under state or federal law to provide any borrower with a modification, once it has done so, however, then the parties have a legally binding contract.

130. "An essential prerequisite to the creation or formation of a contract is a manifestation of mutual assent." *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700 (2007).

131. Both the Plaintiff and Ocwen executed the Agreement with the intent that each be bound by the terms therein.

132. Ocwen has made this clear in using the Agreement to support its proof of claim in the Bankruptcy Court.

133. Although not filed in the Circuit Court, it can be inferred that the affidavit supporting Plaintiff's indebted rests on the Agreement's terms and conditions, as the total amount owed is the same as the amount in the mortgage proof of claim filed in the Bankruptcy Court.

134. Yet, Ocwen cannot have it both ways:  it cannot ask the court to enforce the Agreement against the Plaintiff but ignore the terms and conditions applicable to it.

135. Contracts are interpreted objectively and "[if] the language of a contract is ambiguous, we give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran*, 398 Md. at 16, 919A.2d 700.

136. Mr. Matthew  Parker acknowledged in an email colloquy between Plaintiff and himself on January 27, 2015, that Ocwen had indeed made a mistake regarding the mortgage terms:

> As a result of the errors made when the loan was modified in August 2012, Ocwen has removed the $8,107.32 from the deferred principal balance and has credited $222.00 towards the escrow account. Additionally, we will write off the non-interest bearing principal deferment in the amount of $14,592.68 which would have remained at maturity of the loan, write off the August and September 2014 payments in the amount of $655.50 each, and October 2014, November 2014, December 2014, and January 2015 payments in the amount of $621.28 each. Should the loan continue to receive on time payments, not exceeding 90 days or three (3) monthly payments delinquent, the loan will qualify for the remaining $39,287.78 principal deferment forgiveness leaving $0.00 remaining of non-interest bearing principal deferment.

*Exhibit 7.*

137. It was only Ocwen who modified the loan in August 2012.

138. Ocwen acknowledged its error again in a letter to Mr. Milhail Raykher with the Maryland's Office of the Attorney General, dated February 11, 2015, less than a month after Mr. Parker's revelation:

> Upon further investigation $8,107.32 was included in the non-interest bearing principal deferred balance erroneously.   It was determined that the prior servicer Saxon Mortgage (Saxon) completed a modification in 2008 with a deferred principal balance of $8,107.32 however  Saxon removed the $8,107.32 deferred balance when completing a modification in 2009."

*Exhibit 8.*[15]

139. Paragraph L of the Agreement states in part:  "If an error in the terms hereof is detected after execution of this Agreement, you understand that a corrected Agreement will be provided to you and this Agreement will be void upon notice of such error. Should you elect not to sign any such corrected Agreement, your loan will revert to the terms of your original Loan Documents."

---

[15] *Cf.* fn.10, it took Ocwen over two (2) years to admit that it, not Saxon, had made the $8,701.32 mistake.

140. "For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties." *Robinson v. Gardiner*, 196 Md. 213, 217, 76 A.2d 3543 (1950).

141. There is no ambiguity in paragraph L: "you [Plaintiff] understand that a corrected Agreement will be provided to you and this Agreement will be void upon notice of such error."

142. Ocwen acknowledged that it had made an error; and, therefore, Ocwen was obligated to provide the Debtor with a corrected agreement and the Agreement was void.

143. The language in Paragraph L is not permissive, but is mandatory. *Moss v. Director,* 279 Md. 561, 564-65, 369 A.2d 1011, 1013 (1977)( "It is now a familiar principle of statutory construction in this State that use of the word 'shall' is presumed mandatory unless its context would indicate otherwise.")

144. There is nothing in the language in the Agreement that would cause anyone to think or presume otherwise.

145. Upon Ocwen acknowledging the error, Plaintiff, by not paying the mortgage payments under the voided Agreement, repudiated the Agreement: she neither accepted nor claimed any benefits accruing to her under the void Agreement.

146. A party can ratify a contract by failing to "act to repudiate the agreement promptly, by continuing to act in accordance with the contract, or by continuing to

33

accept or claim benefits flowing from it." *Blum v. Blum,* 59 Md. App. 584, 594-95 (1984).

147. Instead, the Plaintiff asked for and waited for Ocwen to provide the corrected Agreement, which it never did.

148. Ocwen by not adhering to the terms and conditions of the Agreement breached the Agreement.

149. Not only did Ocwen fail to provide the Plaintiff with a corrected Agreement, but failed to acknowledge that the Agreement was void and therefore unenforceable against the Plaintiff.

150. Plaintiff's reliance on paragraph L and Ocwen's failure to provide a corrected agreement and its continued persistence in representing the Agreement as viable and enforceable in both state and federal courts have resulted in Plaintiff suffering great emotional distress, physical manifestation of great emotion distress, embarrassment, loss of self-esteem, humiliation, psychological distress, the loss of value of her home due to her inability to get a rehabilitation loan, negative credit rating, and other non-economic and economic losses.

151. The minor child, JB, also suffered severe emotional distress and constant anxiety due to the removal of the young child from Plaintiff's home, and the effect of the continued distress suffered by the Plaintiff.

152. The injuries to both Plaintiff and JB are a direct result of Ocwen's deliberate failure to provide a corrected agreement upon notice of error in the Agreement.

**WHEREFORE**, the Plaintiff requests actual, consequential, and punitive damages for her and the minor child J.B. in the amount of no less than

$5,000,000.00, and grant Plaintiff such other and further relief as this Honorable Court finds necessary and proper. Plaintiff also requests punitive and trebles damages that will ensure that Deutsche Bank and Ocwen never treat another borrower and his/her family in the manner Plaintiff has been treated since Ocwen began servicing her loan.

**COUNT II**

**VIOLATION OF THE MARYLAND MORTGAGE
FRAUD PROTECTION ACT,
Md. Code Ann., Real Prop. §§ 7-401, et seq.
(Against All Defendants)**

153. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

154. The Maryland Mortgage Fraud Protection Act ("MMFPA"), Md. Code Ann., Real Prop. § 7-401, et. seq., governs the relationship between Defendant Ocwen and Plaintiff.

155. Md. Code Ann., Real Prop. § 7-401(c) provides: "Homeowner" means a record owner of residential real property. The Plaintiff is record owner of the Property in question and is therefore a Homeowner.

156. Md. Code Ann., Real Prop. § 7-401(e) provides: "Mortgage lending process… include[s] [t]he solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan."

157. Md. Ann. Code, Fin. Inst. § 11-501(l) provides: "'Mortgage loan' means any loan or other extension of credit that is: (i) secured, in whole or in part, by any interest in residential real property in Maryland; and (ii) for personal household or family purposes, in any amount."

158. The MMFPA works to protect the interests of all parties to mortgage transactions in Maryland from misstatements, misrepresentations and omissions.

159. Md. Code Ann., Real Prop. § 7-401(d) provides: "Mortgage fraud" means any action by a person made with the intent to defraud that involves:

    1. Knowingly making any deliberate misstatement, misrepresentation or omission during the mortgage lending process with the intent that the misstatement, misrepresentation or omission be relied on by a mortgage lender, borrower or any other party to the mortgage lending process;

    2. Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

160. Similarly, to bringing a common law fraud claim in Maryland, the Plaintiff must show:

    (1) that the defendant made a false representation; (2) that its falsity was either known to the defendant, or the misrepresentation was made with such reckless indifference to the truth as to be equivalent to actual knowledge; (3) that it was made for the purpose of defrauding the person claiming to be injured thereby; (4) that such person not only relied upon it in the full belief as to its truth, and would not have done the thing from which the injury had resulted had not such misrepresentation been made; and (5) that such person actually suffered damage directly resulting from such fraudulent misrepresentation.

*Parker v. Columbia Bank,* 91 Md. App. 346, 604 A.2d 521, 527 (1992)

161. Ocwen as the servicer of the loan falsely represented that it would give the Plaintiff the principle reduction loan modification she was seeking. Plaintiff made it clear to Ocwen that the only reason she was seeking a loan modification was for there to be equity in her home so she could qualify for the Maryland Home Rehabilitation Program.

162. Ocwen assured the Plaintiff that it could provide the Plaintiff with a loan modification to fit her needs.  But, it did not do so.

163. Ocwen acted in bad faith and deceptively when it provided the Plaintiff with a loan modification agreement in which the principle balance of 268 that she had at the time Ocwen started servicing her loan had increased by $8107 to $277,777.79 rather than being reduced as requested had increased by $8957.28 without explanation.

164. Ocwen, even after repeated attempts by the Plaintiff to get an explanation as to the difference in the principal balance, stated over and over that it did nothing wrong or deflected the error to Saxon.

165. Furthermore, Ocwen deceptively included a balloon payment in the loan without disclosing how the balloon payment had been calculated.

166. The balloon payment had the effect of further increasing the principle balance and made it impossible for the Plaintiff to get the home rehabilitation loan.

167. When Ocwen finally admitted that it had made an error in calculating the principle balance at the time of the modification of the loan, the Plaintiff requested that Ocwen, as called for in the Agreement, provide her with a corrected agreement.

168. Plaintiff relied on the clear wording in the Agreement that upon Ocwen's notice of the error that the Agreement would be void and that Ocwen would provide her with a corrected Agreement.

169. These were all deliberate misrepresentations and based on Ocwen's subsequent behavior the misrepresentations were made with a reckless disregard for the truth.

170. Ocwen represented that the Agreement was valid and enforceable by using the terms and conditions within the Agreement to move the Bankruptcy Court to lift the automatic stay and foreclose on Plaintiff's property.

171. The Plaintiff relied on the clear wording within the Agreement to her detriment.

172. Plaintiff continued paying the mortgage amount even though she kept informing Ocwen of the error. Her understanding was that she was obligated to honor the terms of the Agreement until Ocwen noticed the error.

173. Plaintiff also understood that the Agreement was void and that she was no longer obligated to pay under the Agreement because Ocwen would then be sending out a corrected Agreement.

174. Had the terms in Section 4, paragraph L not been in the Agreement the Plaintiff would not have thought the Agreement void and would have continued paying and sought from Ocwen another loan modification.

175. Plaintiff's reliance on paragraph L and Ocwen's failure to provide a corrected Agreement and its continued persistence in representing the Agreement as viable and enforceable in both state and federal courts have resulted in Plaintiff suffering great emotional distress, physical manifestation of great emotion distress, embarrassment, loss of self-esteem, humiliation, psychological distress, the loss of value of her home due to her inability to get a rehabilitation loan, and could now lose the comfort of the family home due to the unlawful foreclosure sale.

176. The minor child, JB, also suffered severe emotional distress and constant anxiety due to the removal of the young child from Plaintiff's home, and the effect of the continued distress suffered by the Plaintiff.

177. The injuries to both Plaintiff and JB are a direct result of Ocwen deliberately misstating that the Agreement would be void and that it would provide a corrected agreement upon notice of any error in the Agreement.

    **WHEREFORE**, Plaintiff respectfully requests the Court enter judgment pursuant to the MMFPA in favor of Plaintiff and against Defendants for: actual damages of not less than $ 1,000,000; treble damages against the Defendant pursuant to Md. Code Ann., Real Prop. § 7-406(c), costs and attorney's fees incurred by Plaintiff; and grant Plaintiffs such other and further relief as this Honorable Court finds necessary and proper.

## COUNT III

**VIOLATION MARYLAND'S CONSUMER PROTECTION ACT ("MCPA"),**
**Md. Code Ann., Com. Law §13-101 *et seq.***
***&***
**MARYLAND'S CONSUMER DEBT COLLECTION ACT ("MCDCA")**
**Md. Code Ann., Com. Law § 14-201**
**(Against all Defendants)**

178. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

179. The mortgage loan servicing and origination practices described herein related to Ocwen, as set forth herein, are governed by the Consumer Protection Act, Md. Code Ann., Com. Law. § 13-101, et seq.

180. Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts. The mortgage servicing and collection of Plaintiff's mortgage payments by Ocwen and the foreclosure involve both the extension of credit and the collection of consumer debts.

181. Section 13-303 also prohibits unfair or deceptive trade practices in the sale or provision of consumer services, such as those performed by Ocwen.

182. The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following:

> "(a) False, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind which has the capacity, tendency effect of deceiving or misleading consumers; and (b)Failure to state a material fact if the failure deceives or tends to deceive."  Md. Code Ann., Com. Law § 13-301(1) and (3).

183. To state a claim under the MCPA, "the [Plaintiff] must have suffered an identifiable loss, measured by the amount the [Plaintiff] spent or lost as a result of his or her reliance on the [defendants'] misrepresentation." *See Lloyd v. General Motors Corp.,* 397 Md. 108, 916 A.2d 257, 277 (2007) (citations omitted).

184. The MCDCA provides that a debt collector may not "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist." Md. Code Ann., Com. Law § 14-202(8).

185. To establish a prima facie case under the MCDCA, Plaintiff must set forth factual allegations tending to establish: (1) Ocwen did not possess the right to collect the amount of debt sought and (2) Ocwen attempted to collect the debt knowing it lacked the right to do so. *See Pugh v. Corelogic Credco, LLC*, No. DKC 13-1602, 2013 WL 5655705, at *4 (D.Md. Oct. 16, 2013).

186. A violation of the MCDCA is also a *per se* violation of the MCPA. Md. Code Ann., Com. Law § 13-301(14)(iii).

187. The MCDCA prohibits "[i]n collecting or attempting to collect an alleged debt" by a collector such as Defendants any "[c]claim, attempt, or threat[] to enforce a right with knowledge that the right does not exist." Md. Code Ann., Com. Law §14-202(8).

188. Based on the four corners of the Agreement, Ocwen knew that the Agreement was void. There is no ambiguity as to the clear wording in Section 4, paragraph L of the Agreement. Ocwen did not have a right to collect the debt.

> "The Court first determines from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."

*Dennis v. Fire & Police Employees Ret. Sys.,* 390 Md. 639, 656-57, 890 A.2d 737, 747 (2006) (quoting *General Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985) (internal quotations omitted)).

189. It is clear that the language in Paragraph L of the Agreement renders the Agreement void.

190. Accordingly, "'A void contract is `not a contract at all' ... and all parties, present and future, would be equally allowed to avoid the contract." *Julian v. Buonassissi,* 414 Md. 641, 666, 997 A.2d 104 (2010) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 7 cmt. a (1981)).

191. Ocwen refused to fulfill its end of the bargain by providing the Plaintiff with a corrected agreement.

192. For nearly three years, Ocwen's personnel kept denying that mistakes had been made in principal balance in the Agreement.

193. It formally acknowledged that it erroneously added $8,107.32 to the deferred principle balance and stated that it would make the corrections.

194. Those corrections were never made as evidenced by the misrepresentation of the total debt due in both the affidavit of indebtedness filed in the Circuit Court and the total indebtedness included in the proof of claim filed in the Bankruptcy Court.

195. Instead, it sent notices demanding payment under the void Agreement.

196. Ocwen hired Brock & Scott to file foreclosure proceedings in the Circuit Court all the while knowing that the Agreement was void.

197. Furthermore, Ocwen obviously did not inform Brock & Scott that the Plaintiff did not owe the $39,287.78, representing the last payment of the deferred principal balance. Nor does it seem Brock & Scott reviewed the Plaintiff's file where it would have seen the October 2014 letter to the Plaintiff wherein Ocwen inform the Plaintiff that the $117,865.33 had been forgiven.

198. While Brock & Scott did not file the Agreement along with the affidavit of indebtedness, the figures in the affidavit are based on the Agreement.

199. Yet, Brock & Scott knew or should have known that the Agreement was void because it is reasonable to assume that it reviewed the Agreement to ensure that the total indebtedness had a foundational basis for accuracy.

200. When Plaintiff filed her Chapter 7 bankruptcy case, Shapiro & Brown filed a motion to lift stay in that case, but without explanation withdrew the motion. When Plaintiff converted to a Chapter 13, Shapiro & Brown filed another motion to lift the stay.

201. Shapiro & Brown filed the void Agreement to support its proof of claim.

202. Plaintiff informed Shapiro & Brown that the Agreement was void, but to no avail. Shapiro & Brown knew or should have known that the Agreement was void.

203. A little over 30 days after the Bankruptcy Court granted Ocwen's motion to lift the automatic stay, Brock & Scott filed a bond in the Circuit Court on October 1, 2017.

204. The Plaintiff received notice of the foreclosure sale several days before the sale scheduled for November 1, 2017.

205. The Plaintiff and her minor charge have suffered grievous harm in the form of severe mental and emotional anguish, physical manifestation of severe emotional distress, depression, public humiliation, and harassment.

**WHEREFORE**, Plaintiff respectfully requests the Court enter judgment pursuant to the MCPA and/or MCDCA in favor of Plaintiff and against all Defendants for actual damages and losses (including economic and non-economic) of not less than $2 million; costs and attorney's fees incurred by Plaintiff; and grant Plaintiff such other and further relief as this Honorable Court finds necessary and proper.

## COUNT IV

### VIOLATIONS OF FAIR DEBT COLLECTIONS PRACTICES ACT
### (Against Defendants Brock & Scott and Shapiro & Brown)

206. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

207. Plaintiff represents that Brock & Scott, Shapiro & Brown have violated these provisions in their attempt to collect this debt. The Defendants violated the FDCPA based on the following:

      a. 15 USC §1692d  -- Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not

communicate with a consumer in connection with the collection of any debt –

(2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer.

   b. Defendants violated 15 USC §1692f(2) -- The false representation of –
     (A) the character, amount, or legal status of any debt.

   c. Defendants violated  15 USC §1692f(5)  --The threat to take any action that cannot legally be taken or that is not intended to be taken.

   d. Defendants violated  15 USC §1692f (6) The false representation or implication that a sale, referral, or other transfer of any interest in a debt shall cause the consumer to –
   (A) lose any claim or defense to payment of the debt; or
   (B) become subject to any practice prohibited by this subchapter.

   e. Defendants violated  15 USC §1692f(10) -- The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

208. To establish a violation of the FDCPA, three requirements must be satisfied: (1) the plaintiff who has been the target of collection activity must be a "consumer", as defined in § 1692a (3); (2) the defendant collecting the debt must be a "debt collector", as defined in § 1692a(6); and (3) the defendant must have engaged in any act or omission in violation of the FDCPA.

209. Plaintiff is a consumer under the FDCPA, which defines the term as "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692a(3).

210. A debt is defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which money, property, insurance, or services

44

which are the subject of the transaction are primarily for personal, family, or household purposes...." 15 U.S.C. § 1692a(5).

211. An obligation to make mortgage payments, as well as fees, penalties, and interest on that mortgage, constitutes a "debt" under the FDCPA.

212. Second, the Fourth Circuit has made it clear that a law firm acting as a substitute trustee in a foreclosure action is a debt collector, as the foreclosure action is an attempt to collect a debt under the FDCPA. *Wilson v. Draper & Goldberg, P.L.L.C.*, 443 F.3d 373, 375 (4th Cir. 2006)

213. Thus, Brock & Scott is a debt collector as it served as substitute trustees in the foreclosure action.

214. Third, Shapiro & Brown is also a debt collector because it represented Ocwen and Deutsche Bank in the bankruptcy case and filed the proof of claim in behalf of Ocwen and Deutsche Bank

215. The Fourth Circuit held in *In re Dubois*, 834 F.3d 522, 528  (4th Cir. 2016) "that filing a proof of claim is debt collection activity regulated by the FDCPA."

216. The FDCPA is a strict liability statute requiring evidence of "the capacity of the statement to mislead; evidence of actual deception is unnecessary." *Nat'l Fin. Servs., Inc.,* 98 F.3d at 139. Thus, knowledge of a statement's falsity is not a necessary element to establish deception. *See LeBlanc v. Unifund CCR Partners,* 601 F.3d 1185, 1190 (11th Cir.2010) ("The FDCPA does not ordinarily require proof of intentional violation and, as a result, is described by some as a strict liability statute.") *Russell v. Equifax A.R.S.,* 74 F.3d 30, 33 (2d Cir.1996)

("Because the Act imposes strict liability, a consumer need not show intentional conduct by the debt collector to be entitled to damages.").

217. Both Shapiro & Brown and Brock & Scott in the state and federal courts falsely represented the Agreement as a valid enforceable contract in violation of §1692f (2) when they knew or should have known that the Agreement was void on its face based on the terms found in Section 4, paragraph L.

218. Defendant Brock & Scott violated §1692f (2) when it filed the entire Order to Docket in the Circuit Court, which was based on the void Agreement.

219. It also particularly violated §§1692f (2) when it included the $39,287.78 – the deferred principal – in the affidavit of total indebtedness. [16]

220. Brock & Scott violated §1692f (5) when it began the foreclosure process by threatening to foreclose of Plaintiff's property when there was no legal document upon which to base the foreclosure, as the Agreement was legally void.

221. Brock & Scott also violated §§1692f  (5), (6), (10) each time it published the foreclosure sale date in the local newspaper, it misrepresented that the Plaintiff had defaulted on her loan and that the Agreement had the force of law.

222. Brock & Scott violated §§1692f (2), (6), (10) when it unlawfully foreclosed on Plaintiff's property on November 1, 2017.

223. Defendant Brock & Scott communicated impermissibly in violation of §1692d with the Plaintiff when it sent to the Plaintiff the report of sales packet after the

---

[16] Based on *Exhibit 6*, the Modification Appeal Review Letter, Ocwen noted that the forgiveness of the $117,865.33 – deferred principal -- to be forgiven upon Plaintiff paying on time in three installment of $39,378.78 over the course of three years had been fully forgiven in July 2014.  (Ocwen stated in the Modification Appeal Review Letter:  "Our records show you received three principal reductions of $39,787.78 on 12/31/2012, 12/31/2013, and 7/7/2014."

sale.[17] The Defendant knew that Plaintiff was represented by counsel and should have sent that packet to the attorney.

224. Shapiro & Brown violated §§1692f (2), (5) , (6), and (10) each time it filed the motion to lift stay in the Bankruptcy Court

225. Shapiro & Brown violated §§1692f (2), (5) , (6), and (10) when it filed a false proof of claim and falsely misrepresented the debt in its efforts to lift the automatic stay:

    a. Past due mortgage payments which varied widely even though the Agreement called for a fixed interest rate of 2%.

    b. The $39, 378.78 representing one payment of the deferred principal balance was included in the total debt.

    c. An escrow projection amount was added to the pre-petition arrears when the pre-petition arrears should be for a fixed period of time.

    d. The pre-petition arrears included an additional five months of mortgage payments.

226. Shapiro & Brown violated §§1692f (2), (5) , (6), and (10) when it filed the motion to lift and argued the same in the Bankruptcy Court.

227. The injuries to both Plaintiff and JB are a direct result of Defendants Brock & Scott and Shapiro & Brown violation the FDPCA.

228. The Plaintiff and her minor charge have suffered grievous harm in the form of severe mental and emotional anguish, physical manifestation of severe emotional distress, depression, public humiliation, and harassment. The Plaintiff, moreover,

---

[17] "The term 'communication' means the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. §1692(b)(2).

suffered economic damages as she could possible lose her home in the unlawful foreclosure sale.

**WHEREFORE**, the Plaintiff prays that this Honorable Court award her the maximum allowable damages under 15 U.S.C. §1692k, to include actual damages, award costs, and attorney's fees incurred by Plaintiff; and award Plaintiff such other and further relief as this Honorable Court finds necessary and proper.

## COUNT V

**RESPONDEAT SUPERIOR**
**(Against all Defendants)**

229. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

230. It is well-established under Maryland law, "[a] principal is *prima facie* liable for the acts of his agent done in the general course of business authorized by him." *Carroll v. State*, 3 A. 29, 29 (Md. 1885).

231. It is undisputed that Ocwen was acting on behalf of Deutsche Bank when it began servicing Plaintiff's mortgage.

232. It is also undisputed that Ocwen hired Brock & Scott as it attorneys and substitute trustees in the foreclosure action and that all of the actions performed by Brock & Scott was to further Ocwen's business as a loan servicer.

233. It is also undisputed that Ocwen hired Shapiro & Brown to serve as its attorneys to collect on the alleged debt in the Bankruptcy Court. Shapiro & Brown furthered Ocwen's business as a loan servicer.

234. It is also undisputed that Brock & Scott and Shapiro & Brown hired individual attorneys to prosecute the actions in the state and federal courts.

235. Plaintiff and the minor child, JB have suffered great emotional distress, physical manifestation of great emotion distress, embarrassment, loss of self-esteem, humiliation, psychological distress, and possible loss of the family home as a direct result of the unlawful actions of Deutsche Bank, Ocwen, Brock & Scott, and Shapiro & Brown and the latter attorneys, in both the state and federal courts.

**WHEREFORE**, Plaintiff prays that the Honorable Court hold Deutsche Bank and Ocwen jointly and severally liable for the unlawful acts of its agents; and award Plaintiff such other and further relief as this Honorable Court finds necessary and proper.

## COUNT VI

### UNCLEAN HAND
### (Against all Defendants)

236. The Court in *Sky Angel U.S., LLC v. Discovery Comms., LLC*, 95 F. Supp. 3d 860, 879 (Dist. Court, D. Maryland (2015)) noted:

> As noted in *Maxtena, Inc. v. Marks,* No. DKC 11-0945, 2014 WL 4384551, at \*14 (D.Md. Sept. 2, 2014), the doctrine of unclean hands provides that: "courts of equity will not lend their aid to anyone seeking their active interposition, who has been guilty of fraudulent, illegal, or inequitable conduct in the matter with relation to which he seeks assistance. The doctrine does not mandate that those seeking equitable relief must have exhibited unblemished conduct in every transaction to which they have ever been a party, but rather that the particular matter for which a litigant seeks equitable relief must not be marred by any fraudulent, illegal, or inequitable conduct." *Id.* (*quoting Dickerson v. Longoria,* 414 Md. 419, 455, 995 A.2d 721 (2010)) (citations and internal quotation marks omitted).

237. "The clean hands doctrine was designed to safeguard the judicial process, not to protect the parties." *McGovern,* 2004 WL 1764088 at *10 (citing *Smith v. Cessna Aircraft Co.,* 124 F.R.D. 103, 106 (D.Md. 1989)).

238. The actions must be such that they impair the court's ability to effectuate a proper finding in a case, "where [defendants'] unethical behavior has worked a fraud on the court and undermined the judicial process." *Id...*

239. As noted in *Mona v. Mona Elec. Group, Inc.,* 176 Md.App. 672, 714, 934 A.2d 450 (2007), "[f]or the unclean hands doctrine to apply, there must be a nexus between the misconduct and the transaction [at issue], because what is material is not that the [parties'] hands are dirty, but that [they dirty] them in acquiring the right [the parties] now asserts." *Id.*

240. The Agreement was and is void on its face. Yet, Ocwen, through Defendants Brock & Scott and Shapiro & Brown used this void document as a basis to foreclose on Plaintiff's property and as a basis in the a Bankruptcy Court to have the court lift the automatic stay, respectively.

241. The law is clear:  a void contract is unenforceable. By presenting this document as enforceable all parties committed fraud upon both the State of Maryland and federal judicial systems.

242. In the foreclosure action as in the Bankruptcy Court, the evidence of the Agreement's validity and enforceability are by-passed due to the nature of the proceedings. Instead Maryland law  and the Bankruptcy Code, in the interest of judicial efficiency, simply require that an affidavit and the proof of claim must

attest to the accuracy of the underlying debt and other financial data that supports the indebtedness of the defendant or debtor.

243. Ocwen through its agents, attested to the accuracy and validity of the Agreement.

244. Had an evidentiary hearing been held, it would have been made clear to the courts that the Agreement was void on its face.

245. The Defendants' past conduct:  asserting that the Agreement is enforceable when it is void on its face and attesting to the truth and accuracy of documents when they contained errors easily discernible by Ocwen's attorneys and Ocwen failure to provide accurate information regarding the Plaintiff's account.

246. And the nexus is present here:  the Defendants are now coming into this forum under the presumption that the Agreement still gives them the imprimatur to assert rights they do not have.

   **WHEREFORE**, the Plaintiff requests that any Motions filed by any Defendant not be granted and/or Answers filed by the any and all Defendants be stricken from the outset; and award Plaintiff such other and further relief as this Honorable Court finds necessary and proper.

.

## COUNT VII

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (Against All Defendants)

247. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

248. The relevant subsections of 18 U.S.C.§ 1962 provide in part:

   (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of

racketeering activity …. to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(b) It shall be unlawful for any person through a pattern of racketeering activity … to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ….

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

249. To state a claim under §1962, Plaintiff must allege that "(1) a defendant person (2) employed or associated with (3) an enterprise, engaged in, or the activities of which affect, interstate or foreign commerce, (4) conducts or participates in the conduct of the affairs of the enterprise (5) through a pattern of racketeering activity." *Sadighi v. Daghighfekr,* 36 F.Supp.2d 279, 295-96 (D.S.C.1999) (citing 18 U.S.C. § 1962(c)); *see also Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("A violation of § 1962(c) ... requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."). Section 1962(c) prohibits a person employed or associated with an enterprise from conducting that enterprise thorough a pattern of racketeering activity. *See Palmetto State Med. Ctr., Inc. v. Operation Lifeline,* 117 F.3d 142, 148 (4th Cir.1997). It is also required that "[t]he enterprise ... be distinct from the persons alleged to have violated § 1962(c)." *Id.; see also New Beckley Mining Corp. v. Int'l Union, United Mine Workers of America,* 18 F.3d 1161, 1165 (4th Cir.1994).

250. At all relevant times, the Plaintiffs and RICO Defendants were "persons" pursuant to § 1961(3).

251. The Defendants' activities affected interstate commerce as Deutsche Bank is a New York Corporation, Ocwen is a Delaware limited liability corporation, Brock & Scott is a North Carolina limited liability corporation, and Shapiro & Brown is a Virginia limited liability partnership and all parties are licensed to do business in the State of Maryland.[18]

252. Deutsche Bank pays Ocwen for its services and Ocwen pays Brock & Scott, and Shapiro & Brown for their services. *Exhibit 9* (invoices to Ocwen submitted by Brock & Stock in the bankruptcy case.)

253. With respect to the requirement that the predicate acts be "related," the Fourth Circuit has explained that "[t]he relationship criterion may be satisfied by showing that the criminal acts `have the same or similar purposes, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events.'" *Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians,* 155 F.3d 500, 505-06 (4th Cir.1998) (quoting *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. 2893).

## The Enterprise

254. RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

---

[18] Interstate commerce is defined as "any commercial transactions or traffic that cross state boundaries or that involve more than one state." www.britannica.com/topic/interstate-commerce-United-States-law.

255. An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity "separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.,* 645 F.Supp.2d 464, 477-78 (D.Md. 2009).

256. "[A]n associated-in-fact enterprise is one type of enterprise defined in § 1961(4)." *United States v. Tillett,* 763 F.2d 628, 631 n. 2 (4th Cir.1985).

257. To satisfy § 1962(c)'s "distinctiveness" requirement, the Plaintiffs must further allege that the RICO "enterprise" is distinct from the defendant "person" alleged to have violated RICO. *Levine v. First Am. Title Ins. Co.,* 682 F.Supp.2d 442, 457 (E.D.Pa.2010); *Toucheque v. Price Bros. Co.,* 5 F.Supp.2d 341, 346-47 (D.Md. 1998). *Tracey v. First American Title Ins. Co*., 935 F. Supp. 2d 826, 840 - Dist. Court, D. Maryland 2013.

258. As noted above both the foreclosure and bankruptcy processes allow evidence to be submitted without being tested under the Rules of Evidence.

259. As noted *supra*, this system has resulted in many homeowners losing their home because the evidence of ownership of the promissory note, the evidence of total indebted are presented to the court with a presumption of truth and accuracy. Hence, the affidavit requirement.

260. But as recent history has shown, this system has been abused.[19]

---

[19] *See Consumer Financial Protection Bureau, the State of Maryland et al. v. Ocwen Financial Corporation and Ocwen et al.,* Case No.: 1:13-cv-02025-RMC, at p. 13. Ocwen's bad acts deal with the courts include:

> p. preparing, executing, notarizing, and presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of
> trustees, and assignments); and

261. Yet, Ocwen is not a law firm, nor does it normally serve as substitute trustees filing the order to docket and other documents to support its right or the holder's right to foreclose on the property.

262. Neither Ocwen nor Deutsche Bank files any of the documents in either the state or federal courts.

263. It is the law firms who filed false and misleading documents, including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments with courts as part of the foreclosure process.

264. It was Brock & Scott who failed to confirm that the affidavit of total indebtedness that Ocwen sent to it was accurate and true.

265. It was Brock & Scott who sent out the foreclosure notices and foreclosure sales dates.

266. It advertised the foreclosure sale and posted the same on its website.

267. It also posted the sales date of the foreclosure on its website.

268. When the hapless Plaintiff sought protection in the United States Bankruptcy Court Ocwen hired Shapiro & Brown to follow her there and filed a motion to lift stay in her Chapter 7.

269. After Plaintiff converted to a Chapter 13, Ocwen renewed its motion to lift stay, filing as evidence of indebted the void Agreement and the faulty proof of claim.

---

q. preparing, executing, notarizing, and filing affidavits in foreclosure proceedings, whose affiants lacked personal knowledge of the assertions in the affidavits and did not review any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as "robosigning."

270. Thus, the enterprise consists of Ocwen using Brock & Scott and Shapiro & Brown -- just as it has done in many foreclosure actions across this country --to continue its scheme of illegal foreclosures.

271. The law firms allowed themselves to be the instruments for undermining the judicial process, taking advantage of the inapplicability of the rules of evidence and the presumption that lawyers would never knowingly or negligently file false or misleading documents in any court of law.

### History of Pattern of Racketeering Activities

272. With respect to the requirement that the predicate acts be "related," the Fourth Circuit has explained that "[t]he relationship criterion may be satisfied by showing that the criminal acts `have the same or similar purposes, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events.'" *Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians,* 155 F.3d 500, 505-06 (4th Cir.1998) (quoting *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. 2893).

273. Sadly Ocwen has a history of racketeering and has used the same methodology in its unlawful activities:  inaccurate and incomplete information and documents in initiating foreclosure proceedings and wrongfully foreclosing and getting its hired law firms to file the documents in the courts. .

274. As noted in the 2013 complaint filed by CFPB and 49 States  against Ocwen in the District Court for the District of Columbia,  the long list of harmful practices the Complaint alleged Ocwen engaged in was, among others "(q) preparing, executing, notarizing, and presenting false and misleading documents, filing false

and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process(including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments)." *Consumer Financial Protection Bureau, the State of Maryland et al. v. Ocwen Financial Corporation and Ocwen Loan Servicing, LLC,* case No.: 1:13-cv-02025-RMC at p. 13.

275. Even after Ocwen was sanctioned and paid $ 2.1 billion to resolve the 2013 complaint, its harm to borrowers continued.

276. As noted in the 2017 CFPB Complaint:

> More generally, Ocwen has serviced borrowers' loans and communicated, orally and in writing, with borrowers using inaccurate and incomplete information, including information relating to borrowers' loan terms, amounts received from and owed by borrowers, escrow amounts, insurance amounts, and/or loss mitigation and foreclosure information. As set forth above and below in Section III, because Ocwen has serviced loans based on inaccurate and incomplete information, it has, among other things, collected or attempted to collect inaccurate amounts from borrowers, failed to timely pay borrowers' insurance policies, provided borrowers with loan modifications with inaccurate terms, and initiated wrongful foreclosure proceedings upon borrowers' loans.

*Consumer Financial Protection Bureau v. Ocwen Financial Corporation et al., Case"* 9:17-cv-80495  filed in the District Court for the District of Florida*,* at p. 21.

277. The 2017 Complaint makes it clear the law firms that Ocwen employs have a history of failing to insure that the information Ocwen is providing to it is accurate. And has failed in turn in providing Ocwen with pertinent information:

From at least 2014 through at least April 2016, Ocwen has been aware that it has not received timely or accurate information from its foreclosure attorneys. For example, in 2014, Ocwen's auditors found that one of Ocwen's largest foreclosure law firms in Florida had failed to timely update Ocwen's system with current foreclosure sale dates for 100 percent of the loan files tested. In response to this finding, the firm explained that it "continues for have periodic, on-going access issues within [Ocwen's systems], which at times hinders our ability to comply with the several issues noted during the audit." In another 2014 audit, Ocwen found that another of Ocwen's Florida foreclosure law firms had failed to upload documents to Ocwen's system for 100 percent of the loan files tested.

The deficiency of Ocwen's policies and procedures was highlighted again in 2015 when Ocwen's auditors found that its foreclosure law firms had failed to provide Ocwen with timely and accurate information.

In May 2016, Ocwen's Head of Foreclosure also testified that he was aware that Ocwen's foreclosure attorneys had not always provided Ocwen with timely and accurate foreclosure information. He further testified that:

• Some of Ocwen's attorney managers tested the accuracy of the data Ocwen's foreclosure firms entered into Ocwen's systems, but acknowledged that not all of Ocwen's attorney managers follow this practice and that the practice was not required by Ocwen's policies and procedures.
• Ocwen's system prevents foreclosure attorneys from making any changes to the foreclosure sale date when there is foreclosure hold on an account, and that Ocwen did not have a policy that required its foreclosure attorneys to contact Ocwen with any updated foreclosure sale date information (since they could not make changes in the system) when a foreclosure hold was in place. 190. As a result of Ocwen's policies and procedure deficiencies, Ocwen has initiated foreclosures, obtained

> foreclosure judgments, and conducted foreclosure
> sales on borrowers' accounts in which Ocwen had
> placed a foreclosure hold.

*Id*. at 55-58

278. The same scheme continues in the case *sub judice*.

279. Ocwen did not provide accurate information to its attorneys, Brock & Scott and Shapiro & Brown regarding the void Agreement, Plaintiff's total indebtedness, and data for the proof of claim.

280. The attorneys, in turn, failed to check the information provided to it by Ocwen when those issues were raised by the Plaintiff in the state and federal courts.

281. In fact, even when they were made aware of the void Agreement as set forth in the Motion for Reconsider on the Motion to Lift Stay, Shapiro & Brown did not even bother to respond or contact Plaintiff's counsel to discuss the matter.

282. The attorneys did nothing to correct the proof of claim and filed a Response to the Objection to the proof of claim that did not respond to any allegations regarding the false data contained therein.

283. In the Response, the only issues relevant to Shapiro & Brown are that the Court lifted the stay and the home was foreclosed upon.

284. Whether Ocwen furnished them with accurate information has not been of any importance.

285. That is exactly want Ocwen needs and wants from the law firms to continue its criminal activities.

286. Again Ocwen, itself, files nothing. The law firms do.

287. Ocwen's *modus operandi*, based on its long history of unlawful foreclosures, is to hire law firms who are willing to take unfair advantage of the streamlined judicial

process – either by not seeing the necessity of fulfilling their obligation as officers of the court to ensure that the information furnished by the client meets all applicable laws or simply not caring about the same.

288. In either case, the results are the same, harm to the borrower and undermining of the judicial process.

289. Ocwen has been a bad actor since 2012 and Brock & Scott and Shapiro & Brown knew or should have known their client had a history of undermining the judicial process and illegally foreclosing on innocent homeowners.

290. Still, these agents never reviewed the Agreement nor did they make any effort to review the proof of claim for accuracy.

291. Shapiro & Brown moved forward to lift the automatic stay without reading the Agreement. It even went so far as to bring an expert witness to testify that Ocwen had made corrections to the deferred principal balance on Plaintiff's loan.

292. Shapiro & Brown did not even bother to confirm that Ocwen's witness was telling the truth about the correction of the $8,107.32 error.

293. That is evident by the proof of claim.  There should never have been a deferred principal balance of $39,287.73 in the proof of claim.

294. The telling point, furthermore,  of its failure is how its attorneys failed to recognize that a fixed rate of 2% interest would yield varying monthly mortgage payments.  That should have sent up a red flag, but it did not.

295. Brock & Scott did not think it strange that Ocwen attested to the accuracy and truth of the affidavit of total indebtedness but only included the original

promissory note. The numbers did not match up, but Brock & Scott never asked for any modifying documents to check the accuracy of the affidavit.

296. Both law firms have been put on notice as to the issues with Ocwen's loan servicing and foreclosure issues; yet, all they did was to further Ocwen's racketeering activities, and have now been snared in the quagmire created by Ocwen.

## **RACKEETERING ACTIVITIES**

297. "[R]ackeetering activity means …(B) any act which is indictable under any of the following provisions of title 18, United States Code: … section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), … section 1503 (relating to obstruction of justice)." 11 USC section 1961(1)

298. To state a plausible claim of a pattern of racketeering activity, the plaintiff must allege facts establishing "that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity." *Cf. H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (reversing a 12(b)(6) dismissal of a RICO complaint and discussing what a plaintiff in a RICO case must show to prove a pattern of racketeering activity).

## **MAIL FRAUD**

299. The elements of mail fraud are: "(1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme." *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *see also Biggs v. Eaglewood Mortg., LLC,* 353 Fed.Appx. 864, 866 (4th Cir.2009) ("Mail fraud occurs when an

individual, having devised a plot to defraud, uses the mail in order to further their plot.").

300. Fraudulent intent may be inferred from the totality of the circumstances and need not be proven by direct evidence. *United States v. Saxton,* 691 F.2d 712, 714 (5th Cir.1982); *United States v. Rhoads,* 617 F.2d 1313, 1316 (8th Cir.1980); *United States v. Beecroft,* 608 F.2d 753, 757 (9th Cir.1979).

301. Ocwen knew that the Agreement was void, but used the United States mail to send Plaintiff's letters threatening to foreclose.

302. Brock & Scott, as an arm of the criminal Enterprise, intended to defraud both the Plaintiff and the Circuit Court, sent to the Plaintiff via the United States Postal Service, the Order to Docket.

303. Ocwen through Shapiro & Brown caused the United States Bankruptcy Court's mail system to send Plaintiff numerous notices regarding their actions in that Court.

304. Shapiro & Brown certified that it had sent to the Plaintiff all documents it filed in the Bankruptcy Court.

305. The notices were sent for the parties to have a veneer of comporting with the law, but at the heart of the matter was void Agreement and false proof of claim that gave rise to the unlawful foreclosure.

306. Brock & Scott also billed Ocwen for services rendered via invoices filed with the proof of claim. It can be inferred that these invoices were either mailed to Ocwen or sent via email.

## WIRE FRAUD

307. "The elements of wire fraud are similar; applying to the use of electronic or telephonic communication." *Foster v. Wintergreen Real Estate Co.,* 363 Fed.Appx. 269, 273 n. 5 (4th Cir.2010).

308. Accordingly, an inference can be made that Ocwen either mailed via the US Postal Service all the documents acquired by the law firms or it emailed all the documents to them.

309. Ocwen, via its agent, Shapiro & Brown, furthered Ocwen's fraudulent activities through the criminal Enterprise by using the cm/ecf system in the Bankruptcy Court to file two motions to lift the automatic stay, affidavits, false proof of claim and other documents.

310. Ocwen also paid the Brock & Scott via ACH.  *Exhibit 9.*

311. These actions were all part of a scheme to unlawfully deceive both the courts and the Plaintiff.

## OBSTRUCTION OF JUSTICE

312. The elements of obstruction of justice, as noted by the Fifth Circuit Court of Appeals in *United States v. Griffin,* 589 F.2d 200 (5th Cir. 1979), : "§ 1503 is composed of two parts: a specific enumeration of types of proscribed activity and an "omnibus" clause describing the activity in general terms.

313. The first portion of the statute prohibits the influencing, intimidation, or impeding of any witness, juror, or court official. The concluding clause of the statute penalizes anyone who "corruptly ... endeavors to influence, obstruct, or impede, the due administration of justice."  589 F.2d at 202-03.

314. Yet, it is not enough for a party to file false or misleading documents that give rise to violation of section 1503, the Defendants have to have scienter that justice is being conducted in the court.

315. Defendants with the intent to impede both state and federal courts in the conduct of their business filed false documents in both the state and federal courts.

316. Brock & Scott filed the Affidavit of Indebtedness containing errors in the calculation of the total indebtedness.

317. The affidavit was based on the void Agreement.

318. The foreclosure sale took place because the Circuit Court was not aware of the void Agreement or that the affidavit was not true and accurate.

319. Ocwen knew that the affidavit was not true and correct because Plaintiff did not owe the $39,287.73. The purpose of the affidavit was to move the foreclosure forward.

320. Shapiro & Brown filed the void Agreement and a false proof of claim in the Bankruptcy Court, which Court, believing in the accuracy of the same as attested by Shapiro & Brown, lifted the automatic stay.

321. Due to the numerous errors in the proof of claim, the Plaintiff was not able to fashion a Chapter 13 plan.

322. All the above actions obstructed the ability of the courts to issue fair and equitable rulings.

323. Both law firms by not verifying the information supplied to it by Ocwen and not reading the Agreement but attesting to its veracity impeded the administration of justice in both State and federal courts.

324. The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.

325. Specifically: the Defendants knew that the Agreement was void and that the documents filed in both the State and United States Bankruptcy Court were not true and accurate.

326. Defendants continuously used the United States Postal Service their scheme to defraud the Plaintiff and to stultify the judicial process in both courts.

327. Ocwen hired law firms that it knew would either not question its information or turned a blind-eye to the information provided.

328. Pursuant to and in furtherance of their fraudulent scheme Defendants committed multiple acts of mail fraud, wire fraud, and prevented the courts from having true and accurate information upon which to render justice..

329. As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962, Plaintiff has suffered a severe loss of value to her family home and now the possible loss of her home due to the foreclosure sale.

   **WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendants for actual damages in the amount of not less than $125,000 including treble damages and attorneys' fees, and grant to Plaintiffs such other and further relief as this Honorable Court finds necessary and proper. .

## COUNT VIII

### DECLARATORY AND INJUNCTIVE RELIEF

330.   Plaintiff incorporates all preceding paragraphs as if set forth fully herein

331.    Plaintiff seeks Declaratory and Injunctive Relief preventing Ocwen and Deutsche Bank from ratifying the foreclosure sale until a decision on the merits has been made in this case.

332.    An actual controversy exists as to the true amount owed by Plaintiff to Defendant.

333.    Declaratory relief is appropriate pursuant to 28 U.S.C. §2201 and Md. Cts. & Jud. Proc. Art. §3-401 to 3-415.

334.    Plaintiff is entitled to an injunction since Ocwen's and Deutsche Bank's actions are improper and illegal.

335.    The public interest is served by preventing Ocwen and Deutsche Bank from harming other borrows and continuing to undermine the integrity of the courts.

336.    The burden imposed to Defendant Ocwen and Deutsche Bank requiring them stay the ratification of the sale is substantially outweighed by the harm suffered by Plaintiffs by allowing Defendant move forward with the ratification of the sale based on fraud.

   **WHEREFORE**, Plaintiff respectfully request the Court order appropriate injunctive relief to rectify past violations of law and prevent further violations of law; including a temporary restraining order, preliminary and permanent restraining injunction on any attempts to ratify the foreclosure sale grant Plaintiff such other and further relief as this Honorable Court finds necessary and proper.


January 16, 2018                                    /s/ Marie Lott Pharaoh
                                                    Marie Lott Pharaoh
                                                    Bar No: 11080
                                                    16029 Dorset Road
                                                    Laurel, Maryland 20707
                                                    (240) 606-3494 Phone

(240) 536-9157 Fax
mariepharaoh@gmail.com

## JURY TRIAL PRAYER

Plaintiff prays a jury trial on all counts stated in the Amended Complaint.

 /s/Marie Lott Pharaoh
Marie Lott Pharaoh

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing of the foregoing Amended Complaint was sent by the Court's ECF system to all parties and counsel of record who entered their appearance, even though service of the original Complaint and this Amended Complaint have not been effected.

 /s/Marie Lott Pharaoh
Marie Lott Pharaoh